**LOUISIANA CREDIT UNION LEAGUE,**
Plaintiff-Appellant,

v.

**The UNITED STATES of America,**
Defendant-Appellee.

No. 81–3134.

United States Court of Appeals,
Fifth Circuit.

Dec. 14, 1982.

---

Joseph A. Barreca, Metairie, La., William Lehrfeld, Leonard J. Henzke, Jr., Washington, D.C., for plaintiff-appellant.

Michael L. Paup, Robert A. Bernstein, Anthony Ilardi, Jr., Tax Div., Dept. of Justice, Washington, D.C., for defendant-appellee.

Before GOLDBERG, WILLIAMS and GARWOOD, Circuit Judges.

GOLDBERG, Circuit Judge:

This case involves the taxability of income generated by the revenue-producing activities of a tax-exempt business league. The district court held that the revenue in question constituted unrelated business taxable income and therefore was subject to taxation. We affirm.

## I. FACTS AND PROCEDURAL HISTORY

### A. Facts

The taxpayer-appellant, Louisiana Credit Union League ("LCUL" or the "League"), is a business league exempt from taxation under section 501(c)(6) of the Internal Revenue Code;[1] its membership consists of both state and federally chartered credit unions. LCUL was organized to serve as a representative body for the development of credit unions in the state of Louisiana. Among the purposes stated in its charter are the following:

(a) To cause the organization and development of credit unions in Louisiana;

(b) To promote, sponsor, and develop educational and training programs for credit union officials;

(c) To publicize the importance of credit union services and benefits;

(d) To promote legislative activity favorable to credit unions;

(e) To foster cooperation among credit unions;

(f) To maintain a league headquarters; and

(g) To provide operational and advisory services to credit unions.

LCUL is supported in part by membership dues. The maximum dues payable by a member credit union are the greater of five percent of the member's gross income or $750.

---

1. All section references are to the Internal Revenue Code of 1954, as amended, unless otherwise indicated.

LCUL also engages in several revenue-producing activities that have generated both operating income and this litigation. Specifically, LCUL serves as a middleman between member credit unions and commercial vendors of insurance, debt collection, and electronic data processing services. In return for its endorsement and administrative assistance, the League receives fees from the companies providing the services to the member credit unions. The League uses these fees to support its general operations. Because of the importance of these activities to the resolution of this matter, we describe them in some detail.

### 1. *Insurance*

One source of revenue for LCUL is the amounts it receives pursuant to contracts with CUNA Mutual Insurance Society and CUMIS Insurance Society, Inc.[2] CUNA/CUMIS offers several lines of insurance coverage for both credit unions and the individuals who are members of credit unions.[3] CUNA/CUMIS is essentially a mutual company marketing only to credit unions. At least two other companies exist that serve credit unions exclusively; additionally, such large general insurance companies as John Hancock, Prudential, and Metropolitan compete for the credit union market. Under its exclusive contract with CUNA/CUMIS, LCUL provides its active support and official endorsement to the CUNA/CUMIS insurance programs offered to credit unions and credit union members. The League also assists in the solicitation of purchases of coverage from its membership.

In return for its activities on behalf of CUNA/CUMIS, LCUL receives commissions based upon a percentage of the premiums received by the insurer from the credit unions and their members. These commissions are commonly 5% or 7½% on initial insurance purchases and 2½% or 5% on renewals.[4]

### 2. *Debt Collection*

A contract with the Central Adjustment Bureau ("CAB"), a debt collector, provides another source of revenue for LCUL. The agreement requires the League to promote the services of CAB by making credit unions aware of their availability. In return for its efforts, the League receives five percent of the amounts collected on delinquent credit union accounts. Ordinarily the member credit unions enter into collection service contracts with LCUL, which provide that the credit union will turn over to the League any unpaid accounts in need of collection. These collection service contracts authorize the League to assign the delinquent accounts to a collector; the League accordingly assigns the accounts referred to it by its members to CAB. LCUL receives as its fee five percent of all amounts collected; CAB retains thirty percent as its own commission and remits the balance to the credit union.[5]

### 3. *Data Processing*

Another source of funds is the League's agreement with the Louisiana Computing Corporation ("LCC"). LCC agreed to prepare a new package of computer programs

---

**2.** CUNA is an acronym for Credit Union National Association, a business league of 51 state credit unions. CUNA Mutual Insurance Society is owned by its policyholders. CUMIS is an acronym for Credit Union Mutual Insurance Society; CUMIS is 98% owned by CUNA. For convenience, the two organizations will be referred to as CUNA/CUMIS.

**3.** The credit unions are required by law to obtain a fidelity bond, and such coverage is available only through CUNA/CUMIS. Other coverages offered to credit unions include an officers' and directors' liability bond, loan protection coverage, and a comprehensive "package of protection." CUNA/CUMIS makes available to the members of credit unions automobile

insurance, group and individual life insurance, and credit disability coverage.

**4.** For the years in issue, LCUL received the following amounts from its insurance endorsements:

| End of Fiscal Year | Amount |
| --- | --- |
| 3/31/75 | $89,281.66 |
| 3/31/76 | $89,918.24 |
| 3/31/77 | $93,735.77 |

**5.** LCUL received the following amounts from CAB during the years in issue:

| End of Fiscal Year | Amount |
| --- | --- |
| 3/31/75 | $ 5,285.19 |
| 3/31/76 | $10,043.42 |
| 3/31/77 | $11,861.00 |

for use by credit unions in return for the exclusive endorsement and marketing assistance of the League. All software relating to credit union processing is jointly owned by LCC and LCUL. LCUL ordinarily promotes LCC services through field representatives. LCUL staffers recommend that the credit unions utilize LCC's data processing services when a computer-assisted accounting system becomes necessary. The League's data processing contracts with its member credit unions generally provide that LCUL will satisfy all their data processing needs. The League currently collects twenty-seven cents per credit union member account for monthly processing, of which it remits only eighteen or nineteen cents to LCC to cover its service charges. Thus LCUL nets eight or nine cents per member account per month from its data processing activities.[6]

### B. Procedural History

LCUL originally brought this refund suit on October 3, 1978, in the United States District Court for the Eastern District of Louisiana. The League's amended complaint alleged that the Internal Revenue Service ("IRS") had wrongfully assessed and collected $77,092.67 in income tax payments under the Internal Revenue Code provisions governing the unrelated business income of tax-exempt organizations;[7] the League sought repayment of that amount, with interest. Both sides moved for summary judgment.

The district court held that the League's insurance, debt collection, and data processing activities constituted "trades or businesses"[8] that were regularly carried on[9] and were not substantially related to the exercise of the League's tax-exempt function.[10] Thus, the court concluded that the net revenue generated by these three activ-

ities constituted unrelated business income of a tax-exempt entity and was subject to tax under I.R.C. section 511(a).[11] Accordingly, the court granted judgment in favor of the IRS. The League now appeals to this court.

## II. ISSUES ON APPEAL

Under certain circumstances an organization may be granted an exemption from tax under I.R.C. section 501. Such a tax exemption is limited by other Code provisions, however, that impose a tax on the "unrelated business taxable income" of otherwise tax-exempt organizations. See I.R.C. §§ 511–514. The income of an exempt organization is taxable if it arises from the organization's regular involvement in any business activity that is not substantially related to its tax-exempt function. I.R.C. § 513(a). The organization's need for funds to further its purposes does not create the necessary substantial relationship. Id.

The appellant is a tax-exempt business league meeting the criteria of section 501(c)(6).[12] Its operating income is derived from two sources: dues from its members and fees from its endorsement and promotion of insurance, data processing, and debt collection services. At issue here is the characterization and resulting taxability of the revenue produced by the League's insurance, data processing, and debt collection activities.

The district court held that each of these activities constituted a trade or business regularly carried on by the League. In addition, the court determined that the activities were not substantially related to the League's tax-exempt function as a business league. Therefore, the court concluded, the

---

6. Under the data processing contracts, LCUL received the following amounts for the years in issue:

| End of Fiscal Year | Amount |
| --- | --- |
| 3/31/75 | $18,411.86 |
| 3/31/76 | $35,444.27 |
| 3/31/77 | $46,150.00 |

7. See I.R.C. §§ 511–514.

8. Louisiana Credit Union League v. United States, 501 F.Supp. 934, 939 (E.D.La.1980).

9. Id. at 940.

10. Id. at 940–41.

11. Id. at 942.

12. The parties agree that the League has been granted tax-exempt status by the IRS, and the validity of that exemption is not in issue.

income from the activities in question was unrelated business taxable income and subject to taxation.

The League challenges the district court's holding in every respect. First, the League asserts that its receipts from insurance activities do not constitute income at all. Next it contends that its insurance and debt collection activities do not rise to the level of a trade or business; failing that, it claims that the insurance, debt collection, and data processing activities are substantially related to its exempt function. Finally, the League points to the legislative history of the unrelated business income tax provisions to support its assertion that no such tax may be imposed without a showing of direct competition between the tax-exempt organization and a taxable entity. We shall address each of these arguments in turn.

## III. THE GUIDING LIGHT: STATUTORY AND REGULATORY BACKGROUND

The complexity of tax legislation is so pervasive that one is tempted to observe that most of it is ghostwritten by Henry Clay. The unrelated business income tax provisions are no exception. Section 501(a) provides the basic exemption from tax for organizations described in section 501(c)(6).[13] The tax exemption provided by section 501(a) is limited, however, by section 501(b), which cautions that otherwise tax-exempt organizations may be subject to tax to some extent. Sections 511 through 514 amplify section 501(b), for they govern the taxation of business income of tax-exempt institutions.

Section 511(a)(1) imposes a tax on the "unrelated business taxable income" of cer-tain tax-exempt organizations. The term "unrelated business taxable income" is defined in section 512(a) as "the gross income derived by any organization from any unrelated trade or business ... regularly carried on by it, less the deductions allowed by this chapter which are directly connected with the carrying on of such trade or business," computed with some modifications not pertinent here. "Unrelated trade or business" is defined in yet another Code section, section 513:

> [A]ny trade or business the conduct of which is not substantially related (aside from the need of such organization for income or funds or the use it makes of the profits derived) to the exercise or performance by such organization of its charitable, educational, or other purpose or function constituting the basis for its exemption under section 501

is deemed "unrelated" for purposes of the tax on unrelated business income. I.R.C. § 513(a).

The term "trade or business" carries us further into the definitional maze of the Code. Section 513(c) states that "the term 'trade or business' includes any activity which is carried on for the production of income from the sale of goods or the performance of services." The regulations barely amplify this statement by noting that the term "trade or business" for purposes of section 513 has the same meaning that it does in the more familiar context of section 162. Treas.Reg. § 1.513–1(b).

The quoted definitions are not particularly technical or convoluted, but by the same token they leave much to the imagination. Thankfully, the regulations provide an analytical framework in which to examine the issues.[14] Section 1.513–1(a) of the

---

13. I.R.C. § 501(c)(6) lists as exempt organizations "[b]usiness leagues, chambers of commerce, real-estate boards, boards of trade, or professional football leagues (whether or not administering a pension fund for football players), not organized for profit and no part of the net earnings of which inures to the benefit of any private shareholder or individual." LCUL is in this category.

14. We are not the first to turn to these regulations for guidance. See Hi-Plains Hosp. v. United States, 670 F.2d 528 (5th Cir.1982); see also infra note 35. Treasury Regulations come to us with great persuasive force because of the expertise of the IRS in administering our nation's tax laws. Redwing Carriers, Inc. v. Tomlinson, 399 F.2d 652, 656 (5th Cir.1968). Consequently, we must defer to the regulations unless they are unreasonable and plainly incon-

Treasury Regulations sets out three inquiries to be used in determining whether amounts received by a tax-exempt organization constitute unrelated business taxable income. The court must ask if:

(1) the income is from a trade or business;

(2) the trade or business is regularly carried on by the organization; and

(3) the conduct of the trade or business is not substantially related to the organization's performance of its exempt functions (other than through the production of funds).

With this three-point approach in mind, we turn to an analysis of the parties' arguments.

## IV. THE FIRST INQUIRY: TRADE OR BUSINESS INCOME?

In determining whether LCUL is to be charged with the unrelated business income tax, we must first ascertain whether the League has income from a trade or business. For these purposes the term "trade or business" includes any activity that is carried on for the production of income from the sale of goods or the performance of services, I.R.C. § 513(c), and generally conveys the same meaning it does in section 162. Treas.Reg. § 1.513–1(b). LCUL first contends that its insurance revenue is not "income" at all, but rather a nontaxable rebate of premiums. LCUL also asserts that neither its insurance promotions nor its debt collection activities rise to the level of a trade or business.[15] Finally, the League argues that its insurance and debt collection work does not constitute a trade or business because it is passive in nature and therefore insufficient to attract the unrelated business income tax.

### A. Nontaxable Rebates or Taxable Income?

In characterizing the fees received from its insurance promotions as nontaxable re-

bates, the League invokes the established principle that mutual insurance premium rebates are not income to the policyholder. *See Penn Mutual Life Insurance Co. v. Lederer,* 252 U.S. 523, 40 S.Ct. 397, 64 L.Ed. 698 (1920); G.C.M. 10798, XI–2 C.B. 58 (1932). In support of this contention, the League cites *New York State Association of Real Estate Boards Group Insurance Fund v. Commissioner,* 54 T.C. 1325 (1970), and Rev. Rul. 64–258, 1964–2 C.B. 134. Each of these authorities involved an association that served as a mere conduit for the transfer of funds from an insurance company to the association's members. Rebates representing excess premium payments were transferred by the insurer to the association and ultimately distributed to the individual members of the association, in whose hands the rebates were nontaxable. Under these circumstances, the funds retained only temporarily by the conduit association were held not taxable to the association.

▪ We find these authorities inapposite to the case at bar. An insurance rebate consists of money *returned* to a policyholder from the premiums he has paid. The League's contracts with CUNA/CUMIS indicate that this insurance revenue was *earned* by virtue of LCUL's endorsement and marketing activities on the carrier's behalf; therefore, it cannot be characterized as a rebate. Nor does LCUL act as a conduit between insured and insurer. Here, as in the authorities cited, the League receives payments from the insurance company, but, unlike the authorities cited, the League makes no corresponding distribution to the individual credit union policyholders. Thus the insurance-related payments received by the League must be considered income in its hands.

### B. Trade or Business?

Having concluded that the League's insurance payments are in fact income, we must now determine whether that income

---

sistent with the Code. *Commissioner v. Portland Cement Co.,* 450 U.S. 156, 101 S.Ct. 1037, 1045, 67 L.Ed.2d 140 (1981).

**15.** With respect to its data processing activities, the League does not make the "no trade or business" argument, apparently conceding the point.

was generated by trade or business activity. In order to develop a cogent standard for determining when an activity rises to the level of a trade or business, we follow the roadmap provided by the Code and regulations.

The plain language of the statute directs that "any activity which is carried on for the production of income" is to be deemed a trade or business. I.R.C. § 513(c). The phrase "carried on for the production of income" limits the types of activities covered and requires an examination of the exempt organization's underlying reasons for engaging in the questioned activity. If the organization has as its motive the production of income, the challenged activity constitutes a trade or business under section 513(c). Thus, the unembroidered language of the Code prescribes the application of a "motive" test. *Accord, Carolina Farm & Power Equipment Dealers Association v. United States,* 541 F.Supp. 86 (E.D.N.C. 1982) (distinguishing between activities designed to produce income and those that generate income incidental to another primary purpose).

The regulations under section 513 strengthen this interpretation of the statute by incorporating the section 162 meaning of the term trade or business. Treas.Reg. § 1.513–1(b). The familiar jurisprudence of section 162, which allows a deduction for trade or business expenses, provides a touchstone for evaluating the status of an activity. "It is well established [for purposes of section 162] that the existence of a *profit motive* is the most important criterion for the finding that a given course of activity constitutes a trade or business." *Lamont v. Commissioner,* 339 F.2d 377, 380 (2d Cir.1964) (emphasis added). *See also Hirsch v. Commissioner,* 315 F.2d 731 (9th Cir.1963); *International Trading Co. v. Commissioner,* 275 F.2d 578 (7th Cir.1960). In addition to the intent to earn a profit, the section 162 usage of trade or business connotes "extensive activity over a substantial period of time" during which the taxpayer holds itself out as a provider of goods and services. *McDowell v. Ribicoff,* 292 F.2d 174 (3d Cir.1961). *See also Stanton v. Commissioner,* 399 F.2d 326 (5th Cir.1968).

■ We believe that the "profit motive" standard is the proper one to be applied in this case, for it is consistent with the plain language of section 513 as well as the accompanying regulations. The statute, which clearly encompasses within its parameters any activity "carried on for the production of income," first raises the issue of motive. The regulations, which invoke section 162 and its "profit motive" gloss, confirm that motive is the key inquiry. Thus, to determine whether a tax-exempt organization is carrying on a trade or business, the court must look to see whether that institution is engaged in extensive activity over a substantial period of time with the intent to earn a profit. *Accord, Professional Insurance Agents v. Commissioner,* 78 T.C. 246 (1982).[16]

■ The district court found that the League engaged in the activities challenged

---

16. In *Professional Ins. Agents v. Commissioner,* 78 T.C. 246 (1982), the Tax Court adopted the section 162 "profit motive" standard of trade or business for section 513 cases. *Professional Insurance Agents* involved factual circumstances similar to the insurance activities carried on by LCUL. The taxpayer was a tax-exempt business league whose membership consisted of Michigan independent insurance agents. The taxpayer performed various promotional and administrative services in connection with malpractice, health, disability, and life insurance programs made available to its members by private underwriters, in return for which it received fees based on a percentage of the premiums paid by participating members. In holding that the fees received were taxable as unrelated business taxable income, the Tax Court first considered whether the taxpayer's activities constituted a trade or business. Relying on the established meaning of the term in the section 162 context, the court stated:

[W]e think the determinative factor in resolving the trade or business issue is whether the activity was engaged in with the intent to earn a profit. If a profit motive is present, normally no further inquiry into the nature of the activity is required in order to determine whether the related expenses are deductible under section 162.

78 T.C. at 262 (citations omitted). Using this "profit motive" test to evaluate the facts, the Tax Court found that the taxpayer was indeed engaged in a trade or business.

here primarily because these enterprises produced revenue necessary to finance the League's operations. Our examination of the record convinces us that this was a finding of "profit motive" and that such a finding was not clearly erroneous. The League's extensive involvement in insurance and debt collection activities has been detailed above. LCUL did everything short of actually selling the insurance and collecting the debts itself: it selected the companies whose products and services would be endorsed, actively marketed and promoted those products and services to member credit unions, and performed the day-to-day administrative tasks essential to the insurance and debt collection operations. More comprehensive involvement would be difficult to imagine. As reflected by the League's receipts for the years in issue, LCUL was amply rewarded for its efforts—its activities were highly profitable, and those profits were increasing. We agree with the district court that the League had the "profit motive" for its insurance and debt collection activities necessary to a finding of a trade or business for purposes of the unrelated business income tax.

LCUL argues that its involvement in the insurance and debt collection activities was primarily passive in nature and therefore did not amount to a trade or business. Citing *Oklahoma Cattlemen's Association v. United States,* 310 F.Supp. 320 (W.D.Okla. 1969), and *San Antonio District Dental Society v. United States,* 340 F.Supp. 11 (W.D.

Tex.1972), the League asserts that no trade or business is present where an exempt organization has no control over the possible financial result of an endeavor.[17] Thus, the League reasons, it is not engaged in trade or business activity because it exercises no control over the financial outcome of the insurance and debt collection enterprises. We do not agree.

We find these cases unpersuasive for several reasons. We note that both cases involved taxable years preceding the 1969 amendments to section 513,[18] which included the first statutory definition of the term "trade or business," now codified at section 513(c). Both *Oklahoma Cattlemen's* and *San Antonio District Dental Society* characterized the definition of trade or business as a "problem," and noted that at that time the Code provided no helpful explanation. *Oklahoma Cattlemen's,* 310 F.Supp. at 322; *San Antonio District Dental Society,* 340 F.Supp. at 14. Thus, both courts were forced to construct a meaning for the term from whole cloth. With the enactment of section 513(c), this sort of interpretation is no longer necessary. Section 513(c) now clearly states that any activity carried on for the production of income constitutes a trade or business. Section 513(c) does not draw a distinction between different types of services, "and thus effectively overrules the active/passive dichotomy employed in the above cases." *Professional Insurance Agents v. Commissioner,* 78 T.C. 246, 263 (1982).[19]

**17.** *Oklahoma Cattlemen's* involved an agricultural organization exempt from taxation under section 501(c)(5) that endorsed the policies of a certain insurance carrier. The organization granted the insurer continuing access to its membership files, issued one letter of endorsement, and allowed its name and insignia to be used on insurance brochures sent to its members. In return, the carrier paid the organization five percent of the premiums it collected. The district court held that the premium rebates were not derived from a trade or business because the organization exercised no control over the possible financial result of the insurance activities. The court distinguished the organization's passive endorsement of the insurance, which it did not consider a trade or business, from more active involvement, such as actual sales of policies and collection of

premiums. In the court's opinion, only "active" participation would qualify as a trade or business. Virtually identical language and logic were applied in *San Antonio District Dental Society* with regard to fees received by a tax-exempt organization in return for its sponsorship of a bank payment plan available to its members.

**18.** Tax Reform Act of 1969, Pub.L. No. 91–172, 83 Stat. 541.

**19.** Even were we to adopt the "active/passive" distinction of *Oklahoma Cattlemen's* and *San Antonio District Dental Society,* we would be compelled to find those two cases distinguishable on their facts from the matter at bar. As the district court in this case noted, the League's activity with regard to insurance and

To summarize, we reject the League's contention that only "active" participation in an enterprise warrants its treatment as a trade or business for purposes of the unrelated business income tax. Instead, we adopt a "profit motive" test for making the trade or business determination, for we believe such a standard to be consonant with the language of the Code and its amplifying regulations. The district court found that the League had a profit motive for its activities and was engaged in a trade or business under section 513(c). We affirm that finding.

## V. THE SECOND INQUIRY: REGULARLY CARRIED ON?

■ Income of a tax-exempt organization is taxable as unrelated business income if it is generated by a trade or business regularly carried on by the organization and not substantially related (other than through the production of funds) to the organization's performance of its exempt functions. Treas.Reg. § 1.513–1(a). We have found that LCUL's insurance and debt collection activities constitute a trade or business for purposes of section 513. The second step in the computation of unrelated business taxable income is determining whether the trade or business is regularly carried on. See Treas.Reg. § 1.513–1(c). The League does not argue that its activities are not regular, and with good reason, for the record indicates that the League's endorsement and administration of these programs was ongoing and continuous. Clearly the League's trade or business activity is "regularly carried on" for purposes of the unrelated business income tax.

## VI. THE FINAL INQUIRY: SUBSTANTIALLY RELATED TO EXEMPT FUNCTIONS?

Having ascertained that LCUL was regularly engaged in trade or business, we now approach the final inquiry. Unless the League's insurance, debt collection, and data processing activities are substantially related to its exempt function, the income they produce will be taxed as unrelated business income. See I.R.C. § 513(a); Treas.Reg. § 1.513–1(a). Section 513(a) plainly states that the need of an exempt organization for income does not constitute the necessary substantial relationship. Beyond that, however, the statute itself provides no definition of substantial relationship, and so we turn once again to the pertinent regulations.[20]

### A. The "Substantial Relationship" Test

Resolution of the substantial relationship issue requires "an examination of the relationship between the business activities which generate the particular income in question ... and the accomplishment of the organization's exempt purposes." Treas. Reg. § 1.513–1(d)(1). The regulations go on to describe the type of relationship that qualifies as "substantial":

Trade or business is "related" to exempt purposes, in the relevant sense, only where the conduct of the business activities has causal relationship to the achievement of exempt purposes (other than through the production of income); and it is "substantially related," for purposes of section 513, only if the causal relationship is a substantial one. Thus, for the conduct of trade or business from which a particular amount of gross income is derived to be substantially related to purposes for which exemption is granted, the production or distribution of the goods or the performance of the services from which the gross income is derived must contribute importantly to the accomplishment of those purposes.

Treas.Reg. § 1.513–1(d)(2). "In determining whether activities contribute importantly to the accomplishment of an exempt pur-

---

debt collection was "considerably more extensive than the activity of the exempt organizations considered in the *Oklahoma Cattlemen's* and *San Antonio* cases." *Louisiana Credit Union League v. United States*, 501 F.Supp. 934,

938 (E.D.La.1981). Thus LCUL hardly falls within any asserted exception for "passive" activities.

**20.** *See supra* note 14.

pose, the size and extent of the activities involved must be considered in relation to the nature and extent of the exempt function which they purport to serve." Treas. Reg. § 1.513–1(d)(3).

The regulations make the League's tax-exempt function a critical factor in the substantial relationship equation. The stated purpose of the League is to promote the organization and development of credit unions in Louisiana, in order to bring about greater participation in the activities of such credit unions by way of attention to personal thrift, money management, and the prudent use of credit. This statement of purpose must be interpreted, however, in light of the League's underlying tax exemption as a business league under section 501(c)(6). Treas.Reg. § 1.501(c)(6)–1 defines a business league as follows:

> A business league is an association of persons having some common business interest, the purpose of which is to promote such common interest and not to engage in a regular business of a kind ordinarily carried on for profit . . . . Thus, its activities should be directed to the improvement of business conditions of one or more lines of business as distinguished from the performance of particular services for individual persons.

Thus the League's tax-exempt purpose, as illuminated by the business league regulations, is to promote the common business interest of its members in advancing the credit union movement. In order for the League's activities to be substantially related to this purpose, they must benefit its members as a group rather than in their individual capacities.

■ The "substantial relationship" determination is necessarily a fact-based inquiry. As this court has recently noted, the regulations under section 513 "require a case-by-case identification of the exempt purpose, an analysis of how the activity contributes to that purpose and an examination of the scale on which the activity is conducted." *Hi-Plains Hospital v. United States,* 670 F.2d 528, 531 (5th Cir.1982); *see also* Treas.Reg. § 1.513–1(d)(2). Two factu-

al elements in particular are critical to finding the necessary substantial relationship between a business league's activities and its purposes: (1) the unique nature of the activities vis-a-vis the organizational function, and (2) the capacity in which benefits are received by the organization's members.

### 1. Unique Character of Activities

■ In order for the activities of a business league to be substantially related to its exempt function, those activities must be unique to the organization's tax-exempt purpose. It is the distinctiveness of the activity that cements the substantial relationship between the two. Such services as educational and training programs, legislative lobbying, and institutional advertising clearly satisfy this uniqueness test, because they advance the purposes of the business league as an entity in itself. It is the institutional ends that must be served if the activity is to be deemed substantially related. Educational, legislative, and advertising services are peculiarly suitable activities for a business league because they further the common business interest that unites the association's members. *See* Treas.Reg. § 1.501(c)(6)–1. In the case at bar, the publication and maintenance by the League of a looseleaf library service compiling all the statutes, regulations, and other legal materials pertinent to the operation of a credit union would exemplify the sort of service unique to the League's tax-exempt function. Such a service, provided to League members for a subscription fee, would bear a unique relationship to the League's purpose of promoting the development of credit unions in Louisiana. Presumably alternative access to such a service would be limited, and its narrow scope would make it singularly useful to member credit unions. Any business league activity so distinctively oriented toward its members seemingly would bear a substantial relationship to its purpose.

### 2. Benefits Accrue to Members Qua Members

■ In evaluating the relationship between the activities and purposes of a busi-

ness league, the capacity in which benefits are received by the organization's members is as important as the unique character of the organization's activities. For a substantial relationship to exist, any direct benefits flowing from a business league's activities must inure to its members in their capacities as members of the organization. Thus, when a business league's uniquely relevant activities produce inherently group benefits that accrue to its members *qua* members, a substantial relationship exists within the meaning of section 513.

This distinction between inherently group benefits and individual benefits is analogous to the aggregate/entity concept familiar in partnership taxation.[21] Just as a member of a partnership may enjoy benefits in his separate capacities as partner and non-partner, so may a member of the LCUL enjoy benefits both as a League member and as an individual credit union. Only those activities that benefit the credit unions in their capacities as League members can be considered substantially related to the League's exempt function. This group benefit standard also accords with the requirement that a business league seek to improve the conditions of an entire line of business rather than perform discrete services for individuals. *See* Treas.Reg. § 1.501(c)(6)–1. When the activities of a business league are directed toward the achievement of the common business interest of its members, the benefits that accrue to its members are inherently group benefits.

To distinguish benefits received by League members *qua* members from those accruing to the credit unions in their individual capacities, it is necessary to segregate the interests of the credit unions as a group from those of the credit unions as separate entities. Because educational programs, lobbying activities, and advertising services serve the common business interest of League members, and because the benefits resulting therefrom accrue to the members in their membership roles, a substantial relationship exists between such activities and the organization's purposes. Activities that serve the interests of the individual member credit unions produce individual benefits insufficient to fulfill the substantial relationship test.

To reiterate, a substantial relationship exists for purposes of the unrelated business income tax provisions when a business league engages in activities unique to its exempt purpose, and those activities generate inherently group benefits that redound to the advantage of its members *qua* members. With this standard in mind, we turn to the facts of the case at bar.

## B. LCUL's Activities

The League argues that each of the three activities at issue here—promotions of insurance, debt collection, and data processing—is intrinsically important to the furtherance of the credit union movement and therefore is substantially related to its exempt function. We will discuss each separately.

### 1. Insurance Endorsement

LCUL asserts that its endorsement of CUNA/CUMIS insurance coverage contributes importantly to the initiation, growth, and stability of credit unions in Louisiana and therefore is substantially related to its exempt function. Basically, the League's argument is that by encouraging the use and purchase of insurance by credit unions, it strengthens the credit union movement by reducing the likelihood of credit union failure from unforseen events. The district court found that "the connection between the furtherance of the credit league movement and the selling of insurance is at best tangential." *Louisiana Credit Union League v. United States,* 501 F.Supp. 934, 941 (E.D.La.1981). We agree. Insurance endorsement and administration is not the sort of unique activity that satisfies the substantial relationship test, nor are its benefits inherently group-related. Rather than merely advising its members of

---

**21.** *See* I.R.C. § 707(a) (payments to partner not acting in capacity as partner); *see generally* 6 J. Mertens, *Law of Federal Income Taxation* ¶ 35.24 (J. Doheny ed. 1975).

the availability and desirability of insurance coverage to credit unions generally, LCUL promoted the purchase of policies from a particular carrier, CUNA/CUMIS. The district court observed that LCUL's insurance activities did little more than generate revenue for the League and provide CUNA/CUMIS with convenient services in the marketing and administration of its programs. Because the League's insurance endorsement is basically a fundraising activity, it is by definition unrelated business activity under section 513(a). We therefore affirm the holding below that LCUL's trade or business of insurance endorsement and promotion was not substantially related to its exempt function. *Accord, Professional Insurance Agents v. Commissioner,* 78 T.C. 246 (1982); *Long Island Gasoline Retailers Association v. Commissioner,* 43 T.C.M. (CCH) 815 (1982); Rev.Rul. 60–228, 1960–1 C.B. 200.[22]

### 2. Debt Collection Services

 LCUL argues that its involvement in debt collection protects the integrity of member credit unions and therefore is substantially related to its exempt purpose.[23] The district court found that the primary purpose of the debt collection service was to earn money for the League. The court

further observed that because only certain members utilized the League's debt collection services, the benefits produced were not inherently group benefits. We believe these findings to be correct. We have no doubt that the individual credit unions that assign their claims to LCUL for collection benefit greatly from the League's services. Nevertheless, LCUL's tax exemption is based on the notion that a business league promotes a common business interest of all its members and does not perform particular services for individual persons. Treas. Reg. § 1.501(c)(6)–1. Because the benefits of LCUL's debt collection activities accrue only to certain credit unions, these activities constitute the performance of services of a commercial nature for individual members rather than the promotion of a common business interest with inherently group benefits. *See also* Rev.Rul. 73–386, 1973–2 C.B. 191 (exempt business league that provided job injury histories to prospective employers is engaged in unrelated trade or business); Rev.Rul. 68–267, 1968–1 C.B. 284 (exempt business league that operated a coupon redemption service for members is engaged in unrelated trade or business). Accordingly, we affirm the district court's holding that the League's debt collection activities are

---

**22.** The cases cited by the League as authority for the proposition that its insurance endorsements are substantially related business activity are for the most part inapposite. LCUL relies upon *Texas Mobile Home Ass'n v. Commissioner,* 324 F.2d 691 (5th Cir.1963), and *Campbell v. Big Spring Cowboy Reunion,* 210 F.2d 143 (5th Cir.1954), for the proposition that an exempt association may support itself through "user fees." These cases are not on point for the simple reason that they involved the associations' initial qualification for tax exempt status; the unrelated business income tax was not an issue in either case. *See supra* note 12.

The League argues further that its receipt of insurance commissions is nontaxable because it serves to reduce the dues of its members, citing *King County Insurance Ass'n v. Commissioner,* 37 B.T.A. 288 (1938). *King County,* which we note was decided prior to the enactment of the unrelated business income tax, held nontaxable a trade association's insurance commissions, the income from which reduced members' dues. In our case, no evidence suggests that the amount of League dues payable

by member credit unions is in any way related to the insurance rebates LCUL receives; in fact, the evidence indicates that dues are determined solely by reference to the gross income of each individual credit union, with a $750 floor. Furthermore, all members of the King County Insurance Association were engaged in the insurance business and thus shared in the industry-wide benefits that resulted when the Association took over servicing all "public business" policies. We find it much easier to perceive the necessary substantial relationship in the case of sales of insurance by an exempt organization composed of insurance agents than when similar activities are carried on by a business league composed of credit unions. *Independent Insurance Agents v. United States,* 79–2 U.S. Tax Cas. (CCH) ¶ 9601 (D.Nev.1979), is distinguishable for the same reason.

**23.** The League also argues that the income derived from its debt collection services is exempt from taxation as a royalty pursuant to I.R.C. § 512(b)(2). We find this argument to be without merit.

not substantially related to its exempt purpose.

### 3. Data Processing Activities

 Finally, the League asserts that by providing credit unions with data processing services it fosters the growth of the credit union movement and thereby contributes importantly to its exempt function. The district court held that the League's data processing services were not substantially related to its exempt function because the benefits flowing from those services were restricted to the participating credit unions. This holding must be affirmed. It appears from the record that some but not all LCUL members utilize the League's data processing services. New and small credit unions have no need for electronic accounting systems and generally use hand-posting methods. Credit unions large enough to support an in-house processing system generally do so. Thus, as with debt collection, only certain members of the League derive the benefits of the data processing services, and these benefits accrue to them as individual participants rather than as League members. We note further that the League charges the credit unions according to the amount of use they make of the program. "When each member contributes in proportion to what he receives, it is a strong indication that the benefits received are not . . . 'inherently group benefits.'" *Evanston-North Shore Board of Realtors v. United States,* 320 F.2d 375, 379 (Ct.Cl.1963). Because the data processing program operates for the primary benefit of participating credit unions, we affirm the district court's holding that it is not substantially related to LCUL's exempt function for purposes of section 513(a). *See also* Rev.Rul. 81–75, 1981–1 C.B. 356 (income received by tax-exempt business league from language translation service is unrelated business taxable income); Rev. Rul. 56–466, 1957–2 C.B. 311 (income received by tax-exempt organization from sale of supplies and equipment to members is unrelated business taxable income).

### C. Summary

The question whether a particular trade or business is substantially related to the exempt function of a tax-exempt business league necessitates an examination and a comparison of the services it renders and the purpose it proclaims. In this case, each of the three challenged activities is related to the League's purpose primarily, if not entirely, by virtue of its revenue-raising potential. Such a financial relationship is by definition not substantial. Furthermore, our review of the record convinces us that the district court was correct in finding that the League's activities were not unique in character and that the benefits produced thereby were not inherently group benefits. According, we affirm the district court's holding that the activities were not substantially related to its tax-exempt purpose.[24]

## VII. UNFAIR COMPETITION?

In addition to the specific contentions addressed above, the League advances the

---

24. In *Hi-Plains Hosp. v. United States,* 670 F.2d 528 (5th Cir.1982), another panel of this circuit held that proceeds of pharmaceutical sales by a hospital pharmacy to nonhospital private patients of doctors located in the hospital were not taxable as unrelated business taxable income. The court expressed its *ratio decidendi* as follows:

> Here, the evidence shows that a small rural community which was without medical services chose to make its hospital pharmacy available to service the private patients of any doctor who would serve in the community. This was only one, though an important component, of a bundle of benefits designed to attract and hold the medical doctor whose

presence was essential to accomplish the broad goal of providing a hospital.

Id. at 533. *Hi-Plains* involved a highly individualized set of facts and circumstances rather than the garden variety commercial activities conducted by LCUL, and for that reason it is not dispositive of the case at bar. Further, because *Hi-Plains* dealt with a tax-exempt hospital rather than a business league, its analysis of the substantial relationship inquiry necessarily differs from that adopted here. We note in conclusion that, unlike the rural community in *Hi-Plains,* LCUL had no difficulty attracting credit unions to its membership. Accordingly, its business activities were not required as inducement to join the League.

overriding policy argument that, because it does not compete unfairly with taxpaying entities engaged in similar activities, it should not be subject to the unrelated business income tax. Based on evidence in the legislative history, the League argues that the unrelated business income tax was intended to prevent unfair competition between tax-exempt and taxable entities; accordingly, the League contends that a showing of unfair competition between LCUL and a taxpaying enterprise is a necessary prerequisite to finding that the League's income is taxable under section 511. In order to treat this issue fully, we must delve into the legislative history of the unrelated business income tax provisions and the cases interpreting that history.

Section 101 of the Internal Revenue Code of 1939, the predecessor to section 501, exempted most religious, charitable, scientific, educational, and fraternal associations from federal income taxation. Before 1950, an exempt organization could acquire commercial business enterprises and avoid paying taxes on the income they generated.[25] Recognition of the adverse effects of this loophole led Congress to enact the predecessors to sections 511–513 in the Revenue Act of 1950.[26]

A fair reading of the legislative history of the Revenue Act of 1950 indicates that Congress indeed was concerned that exempt institutions choosing to enter the marketplace would enjoy an unfair advantage over their taxpaying competitors. See H.R.Rep. No. 2319, 81st Cong., 2d Sess., reprinted in 1950–2 C.B. 380;[27] S.Rep. No. 2375, 81st Cong., 2d Sess., reprinted in 1950–2 C.B. 483; 96 Cong.Rec. 9351, 9366 (1950) (statement of Mr. Lynch). Congress reiterated its interest in preventing unfair competition when section 513 was amended in 1969.[28] Similar language accompanied further amendments in 1978.[29]

---

**25.** Probably the most infamous example of such an acquisition was the purchase of the C.F. Mueller Co., the country's largest manufacturer of noodles, by the New York University School of Law. Under the prevailing "destination of income" test, all profits derived by the company were exempt from taxation because they were used for an exempt purpose. *C.F. Mueller Co. v. Commissioner,* 190 F.2d 120 (3d Cir.1951). *See also* Note, *The Macaroni Monopoly: The Developing Concept of Unrelated Business Income of Exempt Organizations,* 81 Harv.L.Rev. 1280 (1968).

**26.** Pub.L. No. 814, § 301, 64 Stat. 906, 947 (1950).

**27.** The House Report states in part:

The problem at which the tax on unrelated business income is directed here is primarily that of unfair competition. The tax-free status of these section [501] organizations enables them to use their profits tax-free to expand operations, while their competitors can expand only with the profits remaining after taxes. Also, a number of examples have arisen where these organizations have, in effect, used their tax exemption to buy an ordinary business. That is, they have acquired the business with no investment on their own part and paid for it in installments out of subsequent earnings—a procedure which usually could not be followed if the business were taxable.

Your committee's bill does not deny the exemption where the organizations are carrying on unrelated active business enterprises, or require that they dispose of such businesses, but merely imposes the same tax on income derived therefrom as is borne by their competitors. H.R.Rep. No. 2319, 81st Cong., 2d Sess., *reprinted in* 1950–2 C.B. 380, 409. The Senate Report contains virtually identical language. S.Rep. No. 2375, 81st Cong., 2d Sess., *reprinted in* 1950–2 C.B. 483, 506.

**28.** In an effort to avoid unequal treatment of the various types of tax-exempt organizations, the Tax Reform Act of 1969, Pub.L. No. 91–172, 83 Stat. 487, 541, expanded the categories of tax-exempt organizations subject to the unrelated business income tax. The House Report accompanying that legislation referred to "the general problem of unfair competition resulting from the conduct of an unrelated trade or business" and stated that "a business competing with taxpaying organizations should not be granted an unfair competitive advantage by operating tax free unless the business contributes importantly to the exempt function." H.R. Rep. No. 413 (Part 1), 91st Cong., 1st Sess. 44, 50, *reprinted in* 1969 U.S.Code Cong. & Ad. News 1645, 1689, 1695.

**29.** Pub.L. No. 95–502, 92 Stat. 1693, 1702 (1978), added section 513(f) to the unrelated business income tax provisions. This subsection, which legislatively overruled the Eighth Circuit's decision in *Clarence LaBelle Post No. 217 v. United States,* 580 F.2d 270 (8th Cir. 1978), *cert. dismissed,* 439 U.S. 1040, 99 S.Ct. 712, 58 L.Ed.2d 716 (1979), provides that the operation of bingo games will not constitute a

Clearly, Congress was concerned that commercial businesses operated by tax-exempt organizations would enjoy a competitive advantage. But other weighty considerations influenced passage of the unrelated business income tax as well. Revenue objectives played a major role in shaping the statutory design.[30] Congress recognized that ownership of unrelated businesses by tax-exempt institutions narrowed the tax base, causing a substantial loss of revenue. Furthermore, Congress also sought to eliminate an inherent inequity in the overall scheme of taxation by closing the loophole that allowed tax-exempt institutions to operate commercial businesses at no tax cost.[31] Thus, although Congress enacted the predecessors of section 511–513 to eliminate a perceived form of unfair competition, that aim existed as a corollary to the larger goals of producing revenue and achieving equity in the tax system.

This court is by no means the first to be asked to interpret the importance of unfair competition in the context of the unrelated business income tax, nor is it the first to explore the legislative history in search of guidance in its task. Among the courts that have addressed this issue, two lines of authority have developed. One group of courts has found the prevention of unfair competition to be the primary purpose of sections 511–513. *See Hope School v. United States*, 612 F.2d 298 (7th Cir. 1980); *Carolina Farm & Power Equipment Dealers Association v. United States*, 541 F.Supp. 86 (E.D.N.C.1982); *Hill Family Foundation v. United States*, 347 F.Supp. 1225 (D.Minn.1972); *Greene County Medical Society Foundation v. United States*, 345 F.Supp. 900 (W.D.Mo.1972). Another line of cases has prescribed a broader interpretation of the statute, focusing on the multiple objectives of Congress in enacting the

---

trade or business. The related House Report commented that "[i]n general, the unrelated business income tax was imposed to prevent tax-exempt organizations from having an unfair competitive advantage over taxable businesses." H.R.Rep. No. 1608, 95th Cong., 2d Sess. 6, *reprinted in* 1978 U.S.Code Cong. & Ad.News 3716, 3718.

**30.** The Revenue Act of 1950 originally was intended to reduce wartime excise tax rates without increasing the budget deficit that already existed. Congress sought to accomplish this objective by closing certain tax loopholes and adjusting the corporate income tax rates. As the House Report stated:

> Your committee attempted to recoup, by the closing of loopholes, as large a portion of the loss due to excise reduction as possible. The loophole-closing measures contained in your committee's bill replace more than half of the revenue lost in the excise reductions. The balance is accounted for by an adjustment in the corporate income tax rates. As a result there will be no permanent loss of revenue under your committee's bill.

H.R.Rep. No. 2319, 81st Cong., 2d Sess., *reprinted in* 1950–2 C.B. 380. The Report continued by identifying the sources of the replacement revenue: "The major items accounting for the additional revenue are withholding on dividends, the changes in the tax treatment of charitable and educational institutions, [and others]." *Id.* at 381. By the time the bill reached the Senate, the Korean War had begun, and the need for additional revenue was heightened. The Senate Report noted that "[m]ilitary action in Korea coupled with sub-

stantial increases in defense and related expenditures has made it necessary to convert the excise tax reduction bill passed by the House in June of this year into a bill to raise revenues." S.Rep. No. 2375, 81st Cong., 2d Sess., *reprinted in* 1950–2 C.B. 483, 484.

**31.** In his message to Congress regarding the Revenue Act of 1950, President Truman emphasized the importance of closing certain tax loopholes. "Our general objective should be a tax system which will yield sufficient revenue in times of high employment, production, and national income to meet the necessary expenditures of the Government and leave some surplus for debt reduction." 96 Cong.Rec. 769 (1950) (President Truman's message to Congress). He encouraged Congress "to make a number of changes in the tax laws which will bring in some net additional revenues and at the same time improve the equity of our tax system." *Id.* Addressing more specifically the unrelated business income tax provisions, he noted:

> Some tax loopholes have also been developed through the abuse of the tax exemption accorded educational and charitable organizations. It has properly been the policy of the Federal Government since the beginning of the income tax to encourage the development of these organizations. That policy should not be changed. But the few glaring abuses of the tax-exemption privilege should be stopped.

*Id.* at 771. *See also* Treas.Reg. § 1.513–1(c) (purpose of §§ 511–513 was to place exempt and nonexempt businesses on same tax basis).

unrelated business income tax. *See Clarence LaBelle Post No. 217 v. United States,* 580 F.2d 270 (8th Cir.1978), *cert. dismissed,* 439 U.S. 1040, 99 S.Ct. 712, 58 L.Ed.2d 716 (1979); *Disabled American Veterans v. United States,* 650 F.2d 1178 (Ct.Cl.1981); [32] *Professional Insurance Agents v. Commissioner,* 78 T.C. 246 (1982); *Smith-Dodd Businessman's Association v. Commissioner,* 65 T.C. 620 (1975). Our study of the statute, the regulations, the legislative history, and the cases inclines us toward the latter view—that the presence or absence of competition between a tax-exempt organization and taxable entities engaged in similar activities is not in and of itself determinative of whether a tax-exempt organization's business income should be taxed.

 We are mindful that in construing the meaning of a statute, a court must begin with the language of that statute itself. *Touche Ross & Co. v. Redington,* 442 U.S. 560, 568, 99 S.Ct. 2479, 2485, 61 L.Ed.2d 82 (1979). The actual language must be heeded if it is reasonably consistent with the purpose of the statute. *In re Trans Alaska Pipeline Rates Cases,* 436 U.S. 631, 643, 98 S.Ct. 2053, 2061, 56 L.Ed.2d 591 (1978); *United States v. Campos-Serrano,* 404 U.S. 293, 298, 92 S.Ct. 471, 474–475, 30

L.Ed.2d 457 (1971). If the language of the statute is sufficiently clear in its context, it controls. *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 200–201, 214, 96 S.Ct. 1375, 1384–1385, 1391, 47 L.Ed.2d 668 (1976).

As we have noted, the plain language of section 513 dictates that *any* activity carried on for the production of income constitutes a trade or business. Although the legislative history speaks of competition, those who actually drafted the statute avoided the word as if it were the plague. The statute nowhere requires or even suggests that the presence or absence of competition is a factor to be considered in connection with the unrelated business income tax. The statute is formulated in terms that do not seek directly to prevent unfair competition, but rather to extract the same revenue from businesses operated by exempt organizations as that levied upon similar businesses operated by nonexempt entities. For over thirty years, Congress has had the opportunity to create a requirement of competition with taxable entities as a prerequisite for taxation on unrelated business income. It has declined to do so.[33]

 The regulations under section 513 bolster our conclusion that competition is

**32.** *Disabled American Veterans v. United States,* 650 F.2d 1178 (Ct.Cl.1981), holds the distinction of having been cited for support by both sides in this case. While we do not adopt its requirement that an activity be operated in a "commercial manner" to constitute a trade or business for purposes of section 513, we do read *Disabled American Veterans* as focusing on more than merely the presence or absence of unfair competition. *See id.* at 1187 ("Sections 511–13 do not confine UBTI to those situations where it is established that some specific aspect of unfair competition has occurred.").

**33.** Our suggestion that Congress' failure to create a competition requirement manifests its approval of a broader reading of section 513 is based upon more than mere legislative silence. An analysis of the amendment to section 513 contained in the Tax Reform Act of 1976, Pub.L. No. 94–455, 90 Stat. 1520, supports our position. That amendment added subsection 513(d), which expressly excludes from the term "unrelated trade or business" two types of noncompetitive businesses: horse racing at county fairs and renting display space at trade shows. The amendment was enacted in response to a

series of revenue rulings that had found income from the activities in question taxable as unrelated business taxable income. *See* T.I.R. 1409, 1975–2 C.B. 220; Rev.Rul. 68–505, 1968–2 C.B. 248. The amendment and its accompanying legislative history indicate that the 1976 Congress recognized the uncertainty generated by the distinction between competitive and noncompetitive businesses in the section 513 context. *See* S.Rep. No. 938, 94th Cong., 2d Sess., *reprinted in* 1976 U.S.Code Cong. & Ad.News 2897, 3439, 4026. Rather than creating a general exception for noncompeting businesses operated by tax-exempt organizations, however, Congress chose to carve out only two specific exceptions. *See Clarence LaBelle Post No. 217 v. United States,* 580 F.2d 270, 273 (8th Cir. 1978), *cert. dismissed,* 439 U.S. 1040, 99 S.Ct. 712, 58 L.Ed.2d 716 (1979). Again in 1978, Congress had the opportunity to confine the unrelated business income tax to tax-exempt organizations that competed directly with taxable entities; again, Congress created instead only a limited exception for bingo games. Pub.L. No. 95–502, 92 Stat. 1693, 1702 (1978) (codified at I.R.C. § 513(f)).

not essential to the taxability of unrelated business income. Treas.Reg. § 1.513–1(b) states:

> The primary objective of adoption of the unrelated business income tax was to eliminate a source of unfair competition by placing the unrelated business activities of certain exempt organizations upon the same tax basis as the nonexempt business endeavors with which they compete .... However, in general, any activity of a section 511 organization which is carried on for the production of income and which otherwise possesses the characteristics required to constitute "trade or business" within the meaning of section 162—and which, in addition, is not substantially related to the performance of exempt functions—presents sufficient likelihood of unfair competition to be within the policy of the tax.

Thus, the statute and regulations establish a conclusive presumption that the conduct of a trade or business by an exempt organization constitutes unfair competition against taxable entities engaged in similar activities. Further inquiry into the competition question therefore become unnecessary.

 LCUL argues that the imposition of the unrelated business income tax cannot be justified without a showing of unfair competition between the League and a taxable entity engaged in similar activities. We conclude that no such showing is required. Neither the Code nor the regulations mandates proof of actual or threatened competition before the unrelated business income tax can be assessed. While the legislative history indicates that unfair competition was a Congressional concern when the relevant provisions were enacted, it evidences other purposes as well. Such conscious ambiguity is not inherently evil, for there is nothing untoward in Congress' decision to leave a certain flexibility in the statute.[34] Unanticipated situations are sure to arise as experience with a new legislative concept increases. Congress in its wisdom has left to the IRS and the courts the responsibility of grappling with these novel circumstances. This court may exercise its interstitial imagination to determine whether a given set of facts corresponds to the legislative framework constructed by Congress. Our determination is not made in a void, but rather evolves from due consideration of the statute, the legislative history, and the relevant authorities. "[T]he critical question under the statute is not the question of unfair competition, but whether the activity constitutes an unrelated 'trade or business.'" *Clarence LaBelle Post No. 217 v. United States,* 580 F.2d 270, 275 (8th Cir.1978) (Lay, J., concurring), *cert. dismissed,* 439 U.S. 1040, 99 S.Ct. 712, 58 L.Ed.2d 716 (1979). Accordingly, we conclude that the presence or absence of competition between exempt and nonexempt organizations does not determine whether an unrelated trade or business is to be taxed.[35]

## VIII. CONCLUSION

Congress has provided incentives in the form of income tax exemptions for certain

---

**34.** It is not possible to define in the bill exactly every case that is going to be covered. We have drawn it so that there is a certain amount of discretion for the determination of questions of fact as to whether or not a certain matter comes within the purview of the bill.
96 Cong.Rec. 9351, 9368 (1950) (statement of Mr. Lynch).

**35.** Even if we were to assume that some degree of unfair competition is necessary to justify imposing the unrelated business income tax, LCUL as appellant would carry the burden of proving the nonexistence of such competition. *See Professional Insurance Agents v. Commissioner,* 78 T.C. 246, 264–65 (1982). In our judgment, the League has failed to prove that its sponsorship of the insurance and debt collection programs did not place it in a competitive situation vis-a-vis taxpaying enterprises. Indeed, it seems likely on these facts that competition actually does exist at some level. LCUL operates as a type of broker, receiving fees in return for serving as a middleman between supplier and consumer. A tax-exempt middleman can charge lower fees than a taxable one in order to achieve the same net profit. Accordingly, the supplier who deals with a tax-exempt broker has a potential advantage over competitors who do not; he can either charge less for his product or enjoy a larger margin of profit. Thus, potentially anticompetitive consequences at the supplier level may flow from LCUL's status as a tax-exempt business league.

activities it has determined to be particularly desirable. The tax exemption for business leagues recognizes the benefit that the public derives from corporate activities and is intended to aid those activities when they are not conducted for private gain. But when an otherwise exempt organization engages in trade or business for its own sake, and not for the mutual benefit of its members, Congress imposes a tax upon the profits gained thereby. The League has argued, in orbital fashion, that any activity that subserves its interests is related to its charitable function. This argument, carried to its logical conclusion, would completely and without exception subvert the unrelated business income tax. For the reasons set forth in this opinion, we conclude that LCUL is engaged in the regular conduct of insurance, debt collection, and data processing businesses that are not substantially related to its exempt function. Consequently, the income from those businesses is taxable under section 511. Accordingly, the judgment of the district court is hereby and in all things

AFFIRMED.

GARWOOD, Circuit Judge, specially concurring:

I concur in the majority opinion. I write separately merely to reflect my understanding that the majority does not hold to be irrelevant, for purposes of determining if the income at issue is taxable under section 511, whether the exempt organization's function giving rise to the income is active, as opposed to merely passive. Here, as the majority correctly observes (*see, e.g.,* its note 19), LCUL's involvement was clearly "active." That "trade or business" for *these purposes* imports some element of "activity" on the part of the exempt organization seems to be plainly inferable from the language of sections 513(c) and 512(a)(1).*

---

Competition also may exist in a more direct sense between LCUL and taxable entities. The League was engaged in the business of promoting the insurance policies and debt collection services of certain companies to its member credit unions. Its services were similar to those of an agent or broker; the League helped create a market for the insurance and debt collection programs. The record indicates that other organizations, including taxable ones, are involved in the selling or marketing of insurance and debt collection services to financial institutions. Presumably these organizations would have an interest in selling these services to LCUL's members. LCUL, however, possesses a competitive advantage over other brokers by virtue of its special relationship with its members. Therefore, as the district court pointed out, "the League's active endorsement of insurance [and] involvement in debt collection . . . would likely involve it in the competitive marketplace more than sufficiently for the invocation of the tax." *Louisiana Credit Union League v. United States,* 501 F.Supp. 934, 939 n. 6 (E.D.La.1981).

* The first sentence of section 513(c) states: "For purposes of this section, the term 'trade or business' includes any *activity* which is

carried on for the production of income from the *sale* of goods or the *performance* of services." (Emphasis added.)
None of the emphasized words is appropriate to a purely passive income-producing function. Section 512(a)(1) makes plain that not only must the exempt organization derive income from the unrelated "trade or business," but that also such "trade or business" must be one which is "regularly carried on by" *the exempt organization.*

The general rule, reflected by such decisions as *International Trading Co. v. Commissioner,* 275 F.2d 578, 584 (7th Cir.1960), relied on by the Tax Court in *Professional Insurance Agents v. Commissioner,* 78 T.C. 246 (1982), that normally *whatever* expense a corporate taxpayer incurs with intent to earn a profit is a "trade or business" expense under section 162, logically applies to section 162 determinations respecting "for profit" corporations that are indisputably generally engaged in carrying on a trade or business, but not to sections 511–513 determinations respecting nonprofit corporations, such as LCUL, whose corporate purposes and functions are of another kind.