NATIONAL EDUCATION ASSOCIATION OF THE UNITED STATES, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 22838–09.      Filed September 28, 2011.

P is a tax-exempt labor organization described in I.R.C. sec. 501(c)(5). In its FYE Aug. 31, 2001, 2002, and 2003, P published two magazines at an expense of about $7 million, and it distributed those magazines to dues-paying members and to a very few non-member paying subscribers. P's literature and that of its State and local affiliates stated that members received the magazines as a benefit of membership and stated an amount of dues that paid for the magazines. Members who declined the magazines did not pay a smaller amount of dues. P made most but not all of the content of the magazines avail-

100

able for free over the Internet to the general public. P published paid advertising in the magazines, by which it earned approximately $1 million in net profit each year. On its returns P reported negligible circulation income, resulting in a substantial claimed loss on its circulation activity. P used that loss to fully offset its taxable advertising profit. Therefore, P reported that it owed no unrelated business income tax (UBIT). *Held*: Under 26 C.F.R. sec. 1.512(a)–1(f)(3)(iii), Income Tax Regs., which requires an allocation of membership dues to circulation income "[w]here the right to receive an exempt organization periodical is associated with membership or similar status in the organization", the "right to receive" must be a legal right. Under this regulation, P was required to allocate a portion of members' dues to circulation income.

*Miriam L. Fisher* and *Theodore J. Wu*, for petitioner.

*Robin W. Denick* and *Catherine R. Chastanet*, for respondent.

GUSTAFSON, *Judge*: Petitioner National Education Association of the United States ("NEA") is a labor organization described in section 501(c)(5).[1] It is therefore generally exempt from Federal income tax under section 501(a); but to the extent it engages in income-generating activity unrelated to its tax-exempt purposes, it is potentially liable under sections 511 through 513 for unrelated business income tax ("UBIT"). NEA publishes magazines mainly for its members (an activity "related" to its exempt purposes and not subject to UBIT) and sells advertising in those magazines (an "unrelated" activity that *is* subject to UBIT). By a notice of deficiency dated June 25, 2009, the Internal Revenue Service (IRS) determined deficiencies in NEA's UBIT in the following amounts:

| *TYE Aug. 31* | *UBIT deficiency* |
|---|---|
| 2001 | $319,094 |
| 2002 | 444,554 |
| 2003 | 342,371 |

NEA brought this case pursuant to section 6213(a), asking this Court to redetermine those deficiencies.

---

[1] Section references are to the Internal Revenue Code of 1986 (26 U.S.C.), as in effect for the relevant years at issue. Rule references are to the Tax Court Rules of Practice and Procedure.

The issue for decision is whether NEA must allocate a portion of its members' dues to the circulation income of those magazines. The parties agree that the outcome of this dispute depends on whether, for purposes of 26 C.F.R. section 1.512(a)–1(f)(3)(iii), Income Tax Regs., membership in NEA gave members "the right to receive" NEA periodicals. If the members had a "right to receive" the magazines, then: (a) a portion of the members' dues was circulation income; (b) as a result of that income, NEA did not have a loss from circulation activity; (c) NEA's income from advertising (an "unrelated" activity subject to UBIT) was therefore not offset by any circulation losses; and (d) NEA owes tax on the advertising income. NEA concedes that if the IRS prevails on this issue, then the IRS's computations are correct with respect to the amounts of membership dues allocable to circulation income for the years at issue.

For the reasons explained below, we find that membership in NEA did give members "the right to receive" the NEA magazines. Consequently, NEA must allocate a portion of its members' dues to circulation income.

### FINDINGS OF FACT

The parties submitted this case fully stipulated pursuant to Rule 122. The stipulation of facts filed November 26, 2010, and the attached exhibits are incorporated herein by this reference. At the time that NEA filed its petition, NEA maintained its principal place of business in Washington, D.C.

### *NEA and its affiliates*

NEA originated in 1857 as the National Teacher's Association. In 1906 a special act of Congress incorporated the entity under its current name. NEA operates under a charter, a constitution, bylaws, and standing rules; and its stated goals include serving as a national voice for education, promoting the health and welfare of children and/or students, and protecting the rights of educational employees and advancing their interests and welfare.

NEA charters State and local affiliates that meet standards set in NEA's bylaws. The IRS recognizes both NEA and the affiliates as exempt from tax under section 501(a) as section 501(c)(5) labor organizations. Individuals become members of

NEA only by becoming members of one of the State or local affiliates. The affiliates are responsible for enrolling members, collecting and remitting dues, and a variety of other activities.

In the years at issue NEA had 54 main affiliates and more than 2½ million members (of whom more than 160,000 were retired members). Each NEA member paid dues of $123 for the 2000–2001 school year and slightly more in subsequent years. NEA therefore received well over $300 million in dues in each of the years at issue.

### NEA's magazines

NEA produced numerous books, pamphlets, booklets, and other publications. Only two of NEA's publications are pertinent here—NEA Today for active members and This Active Life for retired members. (We refer to these two publications collectively as the "magazines".) NEA began publishing NEA Today in 1982 and This Active Life in 1999.

Since 1982 NEA has published NEA Today. In the years at issue NEA published eight monthly issues of NEA Today over the course of a school year. As the magazine explained to its readers, its "press schedule * * * is set a year in advance". Each issue consisted of 52 pages in a 10-inch by 14-inch newspaper tabloid format. NEA distributed more than 2.4 million printed copies per issue to dues-paying members by mail. About 40,000 NEA members (i.e., less than two percent) declined the subscription, but they did not receive a reduction in their dues for doing so. NEA did not actively promote outside subscriptions and sold fewer than 200 hard copy subscriptions to nonmembers. NEA distributed complimentary copies to NEA employees, employees of NEA affiliates, attendees at NEA hosted meetings, school officials, media representatives, government officials, and members of the public who requested individual issues.

The masthead on the inside of the cover of each NEA Today issue included the following statements:

NEA Today is published eight times a year, monthly, in September, October, November, January, February, March, April, and May by the National Education Association * * *.

*   *   *   *   *   *   *

*NEA Today* is mailed to all NEA members as a benefit of membership. Nonmember subscription price: $45 institutional, $80 domestic and foreign. For members, subscriptions represent $4 of annual dues.[2]

In the years at issue and thereafter, NEA also made articles from NEA Today available free on the Internet to the general public. The Internet version did not contain letters to the editor and excluded the advertising. Despite the availability of articles on the Internet, NEA continued to mail hard copies of NEA Today to members, even to two members in the same household.

Since 1999 NEA has published This Active Life. In the years at issue NEA annually published six bi-monthly issues of This Active Life in standard 8.5-inch by 11-inch magazine format. NEA individually addressed and mailed This Active Life to retired dues-paying members, with per-issue circulations of 175,400, 195,516, and 215,633 for its fiscal years ending August 31, 2001, 2002, and 2003. As with NEA Today, recipients could decline the subscription to This Active Life, though only a small percentage chose to do so. Members who declined delivery did not receive a reduction in their membership dues. NEA did not make available hard copies of This Active Life for purchase or as courtesy copies. As it did with NEA Today, NEA made This Active Life available free on the Internet to the general public.

The masthead on page three of each This Active Life issue included the following statement:

*This Active Life* * * * is published bimonthly by the National Education Association * * *. * * * Annual subscription price: $2.30 (included in membership dues and available only as a part of membership).[3]

*Advertising*

NEA sells advertising space to help defray the expenses of creating, producing, and mailing the magazines. As a result of the advertising revenue, the net cost per member for a year's delivery of NEA Today was $4.10 in the years at issue.

One of the reasons that NEA sent separate issues of the magazines to NEA members in the same household was to

---

[2] The 2001 and 2002 editions listed $4 as the portion of annual dues paid for NEA Today; the 2003 editions listed $4.25. The 2001 and 2002 editions listed $45 as the institutional subscription price; the 2003 editions listed $55.

[3] The portion of annual dues that was stated as paid for This Active Life was increased to $2.35 in the March 2002 publication and to $2.40 in the September 2002 publication.

fulfill circulation volume commitments that NEA made in its advertising contracts.

*References in NEA documents to members' receipt of magazines*

NEA's governing documents contained statements related to NEA publications, as follows:

Article IX, sections 2(b) and 3(b), of NEA's constitution provided that, with respect to amending the NEA constitution and bylaws, "The text of the proposed amendment shall be printed in an official publication sent to all members at least sixty (60) days prior to its consideration."

Section 2–3(c) of NEA's bylaws provided that "[a]ll members shall be eligible to receive * * * reports and publications of the Association in accordance with the policies and procedures of the Association."

NEA's standing rule 9C, sections 1(b) and 2(b), required that proposed amendments to NEA's constitution and bylaws, respectively, "shall be printed in an official publication sent to all members at least sixty (60) days prior to its consideration." Standing rule 10D required further that, with respect to candidates for executive office or membership on the executive committee, "The Executive Director of NEA shall publish in an NEA publication sent to Active members the picture and candidate statement of each candidate".

The May 2001 and May 2002 issues of NEA Today both contained: (1) one and one-third pages of proposed amendments to NEA standing rules, constitution, and bylaws due for vote at the respective upcoming representative assemblies; (2) two-thirds of a page showing the picture and candidate statement of individuals running for NEA executive offices or for membership on the executive committee; and (3) the annual secretary-treasurer's report noted above.

The 2000–2001 NEA Handbook, in a section entitled Benefits of Membership, stated that "NEA members receive a variety of timely and informative periodicals, including NEA Today, a tabloid newspaper".

Consistent with the language on the mastheads of the magazines, the enrollment forms by which a person joined an affiliate and thereby joined NEA include language to the

effect that a portion of members' dues pays for the magazines. [4]

*NEA's tax returns*

To report its unrelated business taxable income (UBTI) from the sale of advertising space in its magazines, NEA submitted each year to the IRS a Form 990–T, Exempt Organization Business Income Tax Return, prepared by its outside accountants. The following table summarizes the figures that NEA reported on the Forms 990–T:

|  | *FYE Aug. 31* | | |
|  | *2001* | *2002* | *2003* |
| Advertising income: | | | |
| Advertising and royalty revenue | $2,904,990 | $3,109,157 | $3,453,075 |
| Less direct advertising costs | 2,055,802 | 1,838,023 | 2,473,046 |
| Net advertising income | 849,188 | 1,271,134 | 980,029 |
| Circulation income: | | | |
| Circulation revenue | -0- | 80,622 | 76,044 |
| Less readership costs[1] | 6,701,587 | 7,557,196 | 7,673,271 |
| Excess exempt expenses (a.k.a. excess readership costs) (limited to net advertising income) | 849,188 | 1,271,134 | 980,029 |
| Unrelated business taxable income: | | | |
| Net profit from advertising (= advertising income less excess readership costs) | -0- | -0- | -0- |
| Less other allowable deductions = taxes, licenses, and other | 100 | 100 | 100 |
| UBTI before net operating loss carryforward | (100) | (100) | (100) |
| Net operating loss carryforward | (339,385) | (339,485) | (339,585) |
| UBTI | (339,485) | (339,585) | (339,685) |
| Tax: | | | |
| UBIT—rate | 35% | 35% | 35% |
| UBIT—tax | -0- | -0- | -0- |

[1]Readership costs included payroll for writers and editors, printing expenses, and postage from mailing the periodicals to members. NEA allocated expenses between advertising and readership using a ratio representing the number of pages of advertising over the total number of pages in the periodicals for each year.

As the above table shows, the circulation revenue that NEA reported was zero for fiscal year 2001 and was minimal for

---

[4] The Alabama enrollment form states, "I understand that of the total NEA dues, $4.50 [is] for a subscription for one year to NEA TODAY, $2.45 for NEA–Retired and/or $16.00 for the Higher Education Publication." The Oklahoma form states, "Subscriptions to OEA publications ($4.11) and NEA today ($4.50) are included." The Oregon form states, "Annual Membership dues to NEA includes $4.50 for NEA Today, and/or $16.00 for the Higher Education publications." The Pennsylvania form states, "I understand * * * of the total NEA dues $4.50 is for a one year subscription to NEA Today." To similar effect, NEA secretary-treasurer's reports (provided to members in NEA Today) stated that $7.70 and $8.32 of the annual membership dues for the two years, respectively, went to "[p]roduce communications that provide a common understanding of Association priorities." The record does not enable us to reconcile those figures, but such a reconciliation is not necessary to decide this case.

fiscal years 2002 and 2003. That minimal revenue consisted of NEA's proceeds from selling subscriptions to nonmembers. The low circulation revenue that NEA reported caused NEA to show excess readership costs, which it used to fully offset its profits from advertising. Accordingly, NEA reported zero UBTI for each of the years at issue. NEA also reported (but did not need to use) a loss carryforward that it derived from excess readership costs in prior years.

### *The IRS's notice of deficiency*

After an examination, the IRS issued a notice of deficiency dated June 25, 2009, determining adjustments to NEA's UBTI and UBIT. The effect of the IRS's adjustments is set out in the table below:

|  | *FYE Aug. 31* | | |
|  | *2001* | *2002* | *2003* |
| --- | --- | --- | --- |
| Advertising income: | | | |
| Advertising and royalty revenue | $2,960,652 | $3,109,378 | $3,453,075 |
| Less direct advertising costs | 2,047,756 | 1,838,023 | 2,473,673 |
| Net advertising income | 912,896 | 1,271,355 | 979,402 |
| Circulation income: | | | |
| Circulation revenue | 8,656,335 | 9,448,601 | 10,517,943 |
| Less readership costs | 6,701,483 | 7,557,196 | 7,673,271 |
| Excess exempt expenses (a.k.a. excess readership costs) | -0- | -0- | -0- |
| Unrelated business taxable income: | | | |
| Net profit from advertising | 912,896 | 1,271,355 | 979,402 |
| Less other allowable deductions = taxes, licenses, and other | 1,200 | 1,200 | 1,200 |
| UBTI before net operating loss carryforward | 911,696 | 1,270,155 | 978,202 |
| Net operating loss carryforward | -0- | -0- | -0- |
| UBTI | 911,696 | 1,270,155 | 978,202 |
| Tax: | | | |
| UBIT—rate | 35% | 35% | 35% |
| UBIT—tax | 319,094 | 444,554 | 342,371 |

As is shown above, the IRS allocated a portion of NEA's membership dues to circulation income, which caused the IRS to determine that for the three years at issue NEA had circulation income of approximately $8.7 million, $9.4 million, and $10.5 million. NEA has conceded that if it must allocate a portion of membership dues to circulation income in the manner that the IRS determined, then NEA would not have a net operating loss carryforward from its fiscal year ended August 31, 2000. The above table also reflects, and NEA has conceded, relatively minor adjustments to NEA's advertising

revenue, royalty revenue, advertising costs, readership costs, and other allowable deductions.

OPINION

I. *Burden of proof*

As a general rule,[5] we presume that the Commissioner's determinations are correct, and the taxpayer has the burden of establishing that the determinations in the notice of deficiency are erroneous. Rule 142(a); *Welch v. Helvering*, 290 U.S. 111, 115 (1933). Similarly, the taxpayer bears the burden of proving entitlement to any adjustments that would reduce the deficiency. *INDOPCO, Inc. v. Commissioner*, 503 U.S. 79, 84 (1992). "[T]he fact that a case is fully stipulated does not change the burden of proof." *Borchers v. Commissioner*, 95 T.C. 82, 91 (1990), affd. 943 F.2d 22 (8th Cir. 1991).

II. *The fragmentation of an exempt organization's activities*

A. *Provisions of the Code*

The Internal Revenue Code taxes the UBTI of an exempt organization as a trade or business activity that is not substantially related to the organization's exempt purpose. Sec. 511(a)(1). One of the main purposes for taxing UBTI is to prevent unfair competition with taxable counterparts and to curb related abuses by otherwise nontaxable businesses. *United States v. Am. Bar Endowment*, 477 U.S. 105, 114 (1986); *United States v. Am. College of Physicians*, 475 U.S. 834, 837–838 (1986). Corollary aims include the "'larger goals of producing revenues and achieving equity in the tax system.'" *Am. Med. Association v. United States*, 887 F.2d 760, 772 (7th Cir. 1989) (quoting *La. Credit Union League v. United States*, 693 F.2d 525, 540 (5th Cir. 1982)).

The Code generally defines UBTI as gross income from an unrelated trade or business less allowable deductions connected directly with the carrying on of such trade or business. Sec. 512(a)(1). For these purposes, a trade or business may include not only a complete business enterprise but also

---

[5] Under certain circumstances, if the taxpayer meets specific criteria, the burden of proof can shift to the Commissioner. See sec. 7491(a). However, NEA did not argue for a shift in the burden of proof, and the record does not suggest a basis for such a shift.

any component activity of a business. 26 C.F.R. sec. 1.513–1(b).

B. *Provisions of the regulations*

With respect to periodicals published by tax-exempt organizations, section 1.512(a)–1(f)(3)(i) of the regulations "fragments" the organization's taxable trade or business of selling advertising space (i.e., advertising income) from the organization's nontaxable activity of publishing readership content related to the organization's exempt purpose (i.e., circulation income). See *Am. Med. Association v. United States*, 887 F.2d at 764; *W. Va. State Med. Association v. Commissioner*, 91 T.C. 651, 656 (1988), affd. 882 F.2d 123 (4th Cir. 1989). The approach likewise divides the periodical's costs into two categories: direct advertising costs and readership costs. 26 C.F.R. sec. 1.512(a)–1(f)(6)(i).

The organization may deduct the full amount of direct advertising costs from gross advertising income, 26 C.F.R. sec. 1.512(a)–1(f)(2)(i); and in this case the IRS generally allowed these deductions (with only minor adjustments not now in dispute). In addition, the organization may deduct from its advertising income the readership costs that it incurs in the same year, but only if those readership costs exceed circulation income (and thereby yield "excess readership costs"). 26 C.F.R. sec. 1.512(a)–1(f)(2)(ii)(b). The following formula conceptualizes these rules: (1) Gross advertising income, minus (2) direct advertising costs, minus (3) excess readership costs (the amount by which readership costs exceed circulation income), equals (4) net UBTI from the sale of advertising. *Natl. Association of Life Underwriters, Inc. v. Commissioner*, T.C. Memo. 1992–442, 64 TCM (CCH) 379, 386, revd. and remanded on other grounds 30 F.3d 1526 (D.C. Cir. 1994).

The rationale for allowing the deduction of excess readership costs—but only where they are *excess* readership costs—is that where there are such excess costs, the circulation activity is not self-sustaining, and therefore the exempt organization needs the paid advertisements to cover the shortfall. In other words, the paid advertising "'contribute[s] importantly'" to maintaining the publication's exempt purpose. *Am. Med. Association v. United States*, 887 F.2d at 763

(quoting *United States v. Am. College of Physicians*, 475 U.S. at 847)). If, on the other hand, the organization earns a profit on its circulation income,[6] then the publication did not need any advertising revenue to sustain its readership content, and therefore, the advertising was not " 'substantially related' " to the organization's exempt purpose, *id.*; the advertising was, instead, a fundraising activity in competition with non-exempt publications that likewise sell advertising and must pay income tax on their profits. Consequently, when the circulation activity earns a profit, the exempt organization may not deduct its readership costs against its advertising income, and the organization must pay UBIT on its profits from advertising. *Id.*

C. *The parties' contentions*

The disputed issue in this case is the calculation of NEA's circulation income. NEA contends that its members did not have "the right to receive" the magazines because NEA was under no obligation to continue publishing—it could stop sending issues at any time—and because its members as well as the general public could access the magazines for free on the Internet. NEA therefore contends that it (a) had virtually no circulation income, (b) consequently had substantial excess readership costs, and (c) can deduct those costs from its advertising income, reducing that income to zero.

The IRS contends, to the contrary, that NEA members had the right to receive the magazines because a portion of NEA's members' dues was in fact paid for magazines. The IRS therefore contends (a) that NEA had substantial circulation income that more than covered the cost of producing the magazines, (b) that NEA consequently had *zero* excess readership costs, and (c) that as a result NEA had unrelated business taxable income from its paid advertising.

---

[6] Since the organization's publication is a means of accomplishing its exempt purpose, the net profit resulting from the publishing activity is treated as income *related* to its exempt activity, not unrelated income. The advertising, however, is treated as a distinct activity that is *unrelated* and therefore taxable.

III. *The meaning of "the right to receive"*

A. *The regulatory language at issue*

The outcome in this case is determined by 26 C.F.R. sec. 1.512(a)–1(f)(3)(iii), Income Tax Regs., which provides as follows:

Where *the right to receive* an exempt organization periodical is associated with membership or similar status in such organization for which dues, fees or other charges are received (hereinafter referred to as "membership receipts"), circulation income includes the portion of such membership receipts allocable to the periodical (hereinafter referred to as "allocable membership receipts"). * * * [Emphasis added.]

B. *The lack of "plain meaning"*

The starting point for interpreting a regulatory provision is its plain meaning, *Intermountain Ins. Serv. of Vail, LLC v. Commissioner*, 134 T.C. 211, 218 (2010), revd. on other grounds 650 F.3d 691 (D.C. Cir. 2011), and NEA argues that the interpretation of the phrase "the right to receive" is clear on its face as meaning a legally enforceable claim or interest. To support its position, NEA points to definitions for the word "right" in Black's Law Dictionary 1436 (9th ed. 2009) (Black's),[7] from which it quotes the first five definitions:

*right*, *n.* (bef. 12c) *1*. That which is proper under law, morality, or ethics <know right from wrong>. *2*. Something that is due to a person by just claim, legal guarantee, or moral principle <the right of liberty>. *3*. A power, privilege, or immunity secured to a person by law <the right to dispose of one's estate>. *4*. A legally enforceable claim that another will do or will not do a given act; a recognized and protected interest the violation of which is a wrong <a breach of duty that infringes one's right>. *5*. (*often*

---

[7] NEA also relies on *Lamont v. Postmaster General*, 381 U.S. 301, 305–306 (1965), but the authority is off the mark. *Lamont* held that, because the First Amendment bars Congress from "abridging" the freedom of the press, the Government may not interfere with an addressee's ability to receive his mail. The phrase "right to receive" does not appear in the majority opinion in *Lamont*; and even if it did, invoking authorities that address First Amendment rights—which plainly are enforceable legal rights, see U.S. Const., art. VI ("This Constitution * * * shall be the supreme Law of the Land")—begs the question whether a member's "right to receive" magazines from NEA is in fact, like First Amendment rights, a legal right. Even if NEA has no obligation to produce and the member has no right to receive NEA Today, the Government is presumably barred from blocking the member's receipt of the magazine once it is mailed, so that, vis-a-vis the Government, NEA members can be said to have "the right to receive" NEA's magazines without Government interference. However, the question whether the Government could bar NEA members from receiving NEA Today (a question more like the one at issue in *Lamont*) is a different question from whether, vis-a-vis NEA, the member has "the right to receive" the magazine.

*pl.*) The interest, claim, or ownership that one has in tangible or intangible property <a debtor's rights in collateral> <publishing rights>. * * *

Of these, NEA asserts that the fourth is the most fitting—i.e., "A legally enforceable claim that another will do or will not do a given act; a recognized and protected interest the violation of which is a wrong".

The IRS argues for an interpretation of "right to receive" that is less stringent than a legally enforceable right. The IRS criticizes NEA's selection from the definitions in Black's and asserts that the "just claim" portion of the second definition ("Something that is due to a person by just claim, legal guarantee, or moral principle") is the one most consistent with the regulation. Whether or not the IRS's counter-selection is superior, it must be noted that Black's definitions of a "right" include both a "legally enforceable" claim (No. 4, to which NEA prefers to point) *and* a claim that is merely "just" or "moral" (No. 2, to which the IRS prefers to point). Consequently, we conclude that we cannot determine, by "plain meaning", whether a "right to receive" must be legally enforceable, and that other interpretive principles must be consulted. [8]

C. *The lack of an agency position to which a court could defer*

In support of its position, the IRS invokes the principle that an agency's interpretation of its own regulation is controlling unless it is "'plainly erroneous or inconsistent with the regulation.'" *Auer v. Robbins*, 519 U.S. 452, 461 (1997) (quoting *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 359 (1989)); *Lantz v. Commissioner*, 132 T.C. 131, 144 n.10 (2009), revd. on other grounds 607 F.3d 479 (7th Cir. 2010). However, the application of this principle to resolve the current dispute is difficult, first, because of unclarity in the IRS's position. The IRS stops short of adopting Black's definition No. 2 of "right" ("due to * * * just claim * * * or moral principle"), and does not declare what should be the precise interpretation of "right to receive", other than to say what it is *not*—i.e., it is not necessarily an enforceable legal right to receive. The IRS contends that, on a case-by-case basis, courts

---

[8] The rules of statutory construction also apply to the construction of regulations. See *Estate of Schwartz v. Commissioner*, 83 T.C. 943, 953 (1984).

should apply an unspecified looser standard. We cannot defer to a position that is not expressly articulated.

Deference here to the agency's interpretation is difficult, second, because the IRS is unable to show that the agency has in fact stated a position on the interpretation of "right to receive". Its only cited support for the existence of an announced agency position is the preamble to the final regulations at issue, which states: "Where periodicals *are furnished* dues paying members * * * without further charge, a portion of the dues must be allocated to the circulation income of the periodical." 40 Fed. Reg. 58638 (Dec. 18, 1975) (emphasis added). However, if this statement were the agency's position on the meaning of "the right to receive", it would prove far too much. This sentence alone, construed literally, would call for allocation of income not when there was a "right to receive" (whether legal *or* moral) but whenever the periodical was "furnished", with or without the organization's prior promise or prediction. If courts were obliged to defer to that sentence in the preamble to govern disputes like the current one, then the requirement of a "*right* to receive" would be displaced by the notion of mere receipt; whenever members *received* a periodical (whether or not they had a *right* to receive it), income would be allocated.

But the IRS does not advance that interpretation of the regulation (and for good reason, since it would ignore the actual language of the regulation). Rather, its position does acknowledge that there must be a showing of a "right" of some sort, and for that position the preamble language gives no support. We therefore find no articulated agency interpretation to which we could defer.

### D. *The lack of comparable regulations*

To put in perspective the "right to receive" regulation at issue here, the IRS points to one regulation that looks to "an *enforceable* right to receive"[9] and another that looks to "a *legally enforceable* right to receive."[10] In these regulations, the modifiers "enforceable" and "legally enforceable" either are surplusage or else suggest (as the IRS contends) that

---

[9] 26 C.F.R. sec. 20.2039–1(b)(1)(ii), Estate Tax Regs. (emphasis added) (concerning the inclusion of an annuity or other payment stream in the gross estate of a decedent).

[10] 26 C.F.R. sec. 1.823–6(c)(2)(ii), Income Tax Regs. (emphasis added) (concerning statutory underwriting income or loss for mutual insurance companies).

there can be a "right to receive" that is *not* legally enforceable. And if there can be such a non-enforceable "right", then where such modifiers are absent (as in the regulation at issue), a "right to receive" should (the IRS contends) be considered to exist even where it is *not* enforceable.

By way of example, the IRS points to one regulation where "right to receive" lacks such modifiers and is indeed understood to refer to a non-enforceable right: [11] 26 C.F.R. section 1.451–1(a) provides that "[u]nder an accrual method of accounting, income is includible in gross income when all the events have occurred which fix the *right to receive* such income and the amount thereof can be determined with reasonable accuracy." (Emphasis added.) In *Flamingo Resort, Inc. v. United States*, 664 F.2d 1387, 1388 (9th Cir. 1982), the Court of Appeals for the Ninth Circuit held "that accrual [of income] was proper despite the absence of legal enforceability." That is, in the income accrual context, a "right to receive" could apparently exist even where there was not necessarily a *legally enforceable* right to receive. If that is true with respect to the accrual regulation at issue in *Flamingo Resort*, then (the IRS contends) it is also true with respect to the circulation income regulation at issue here.

"'It is generally presumed that Congress acts intentionally and purposely' when it 'includes particular language in one section of a statute but omits it in another.'" See *Lantz v. Commissioner*, 132 T.C. at 139 (citing *City of Chicago v. Envtl. Def. Fund*, 511 U.S. 328, 338 (1994)). We likewise presume that the Secretary of the Treasury acts intentionally when including language in one section of a regulation but not another. This principle, however, does not necessarily extend to construing common language that occurs in different regulations, especially not when their context and purpose are very different, as they are here. The phrase "right to receive" appears in dozens of different contexts in the

---

[11] In fact the IRS points to two regulations, but one is clearly inapposite: 26 C.F.R. sec. 1.691(a)–1(b), Income Tax Regs., provides that "the term income in respect of a decedent [IRD] refers to those amounts to which a decedent *was entitled* as gross income" (emphasis added); and *Rollert Residuary Trust v. Commissioner*, 752 F.2d 1128 (6th Cir. 1985), affg. 80 T.C. 619 (1983), held that "[t]he key test for determining whether the decedent had a 'right' or was 'entitled' to the post-mortem bonus should be based on the likelihood, at the time of his death, that he would receive the bonus, *not on his legal rights* to it", *id.* at 1132 (emphasis added), thus showing that an "entitlement" might exist even where there may not be a *legal* right. However, a regulation involving an "entitlement" is hardly in pari materia with a regulation involving a "right to receive", especially where their respective contexts (IRD and UBTI) are so different.

Code and regulations. [12] Under the accrual regulation the IRS cites, "the issue is *when* does the right to receive the income * * * become 'fixed' for accrual purposes". *Flamingo Resort, Inc. v. United States*, 664 F.2d at 1388 (emphasis added). Thus, the focus of the cited provision in the accrual regulation is not whether there is revenue (which is presumed) but rather the timing of the recognition of revenue, whereas the focus of the circulation income regulation at issue here is not when but whether circulation income ought to be allocated at all.

We therefore do not find that the meaning of "right to receive" in the circulation income regulation is informed by its meaning in the other regulations the IRS has cited.

### E. *Our analysis of "the right to receive"*

The interpretive question to be decided is whether "the right to receive" in 26 C.F.R. section 1.512(a)–1(f)(3)(iii) is, as NEA contends, a legal right or is instead, as the IRS contends, a "right" founded on a claim that is just or moral but not enforceable or legal. We hold that the "right to receive" must be a legal right.

Pursuant to section 7805(a), the Secretary has the authority to "prescribe all needful rules and regulations for the enforcement of" the unrelated business income tax. He thus had the power to articulate, by regulation, the standard by which membership dues would and would not be allocated to circulation income. He did not promulgate a regulation that allocates membership dues to circulation whenever members simply "*receive* a periodical", or whenever they have a "reasonable *expectation* of receiving a periodical", or whenever they have a "*just or moral claim* to receive a periodical". Instead, the IRS's regulation allocates dues when a "*right to receive* an exempt organization periodical is associated with membership * * * for which dues * * * are received". 26 C.F.R. sec. 1.512(a)–1(f)(3)(iii) (emphasis added).

We believe that "right to receive" is a term that the Secretary would not have used if he had intended the regulation to set any of those looser standards. To interpret that term to mean that mere receipt triggers allocation (which the IRS

---

[12] A computer search revealed 253 instances where provisions in the Code, in final regulations, or in temporary regulations use the phrase "right to receive".

does not argue), one must effectively ignore the word "right" in the regulation. To interpret that term to mean that expectation of receipt triggers allocation (which the IRS does not explicitly argue), one must equate "expectation" with "right"—two terms that are not at all interchangeable. To interpret that term to mean that a non-enforceable just or moral claim gives rise to a non-legal "right" that triggers allocation (which the IRS does appear to argue), one must read the regulation as conferring on the tax collector and the courts the responsibility of adjudicating justice and morality in the sphere of membership periodicals. While it cannot be said that the Internal Revenue Code never makes tax consequences turn on other-than-legal considerations, see, e.g., sec. 6015(f) (granting relief from joint liability where "it is inequitable to hold the individual liable"), it is nonetheless overwhelmingly true that the Code sets up rights and responsibilities that are determined by objective, reviewable, legal standards. The IRS does not explain, and we cannot imagine, the rules or standards by which one would make the non-legal determination of the justice or morality of a member's claim to an organization's periodical. We decline to hold that this difficult and improbable regime is enacted into the UBIT rules by the term "right to receive".

Instead, we hold that membership dues are allocated to circulation income when the dues-paying members have a legal right to receive the organization's periodical.

IV. *Whether NEA's members had a legal "right to receive" the periodicals*

A. *The parties' arguments*

NEA claims that its members had no legally enforceable right to receive the periodicals, and therefore that an allocation of membership dues under 26 C.F.R. section 1.512(a)–1(f)(3)(iii) is inappropriate. NEA also contends that by making the publications available free on the Internet, it negates any right that the members might otherwise have to receive the periodicals and therefore nullifies any requirement under the regulation for NEA to allocate its membership dues.

The IRS counters that NEA failed to meet its burden of establishing that its members did not have a legal right to the periodicals and that the preponderance of the evidence

shows that NEA's members did have a legally enforceable right to receive the publications. Further, the IRS contends that NEA is wrong about the significance of its Internet publications. For the reasons discussed below, we agree with the IRS.

B. *The right to receive the periodicals under NEA's governing documents*

Section 2–3(c) of NEA's bylaws states that members are "eligible to receive * * * publications of the Association in accordance with the policies and procedures of the Association". This bylaw would appear to resolve the issue and grant NEA's dues-paying members "the right to receive" the magazines. NEA rejoins that this provision does not say *which* publications would be received and argues that it maintained the right to unilaterally reduce or eliminate the number of periodicals it published.

NEA's bylaws do not explicitly reserve that right to NEA, and the following evidence shows that NEA could not halt publication of the magazines at its whim.

1. *NEA's practical obligation to publish*

NEA's periodicals at issue are not mere pamphlets or mimeographed newsletters but are substantial magazines, for which the "press schedule * * * is set a year in advance". Nothing in the record in this case would support the suggestion that NEA could simply halt publication. At any given moment when a member pays his dues, NEA has a year's worth of periodical issues in the pipeline—and under the bylaws the member is "eligible" to receive them when they are published.

Other provisions in NEA's governing documents indicate that NEA could not simply cease publication at its discretion: Standing rule 9C, sections 1(b) and 2(b), and standing rule 10D required that NEA publish proposed amendments to its constitution and bylaws and annual candidate pictures and statements in publications that it sends to members; and it was in NEA Today that NEA fulfilled that requirement. NEA argues that nothing would have prevented NEA from issuing the required notices to members in some other official NEA publication, including an annual report or special publica-

tion. NEA, however, provided no evidence that it has ever used these alternative means of communication. Clearly, NEA Today was NEA's normal means of communicating with members, and NEA's modus operandi was to use NEA Today to fulfill the obligations imposed by its bylaws.

### 2. *Contracts with advertisers*

The record does not include NEA's contracts with its advertisers, but it does show that NEA did have such contracts, in which it made commitments about the volume of its circulation. NEA has not shown how it could halt publication without violating those contractual commitments.

### 3. *Postal regulations*

Another practical impediment to NEA's cessation of publication results from the postal regulations. Section E211.10.5(c) of the Domestic Mail Manual ("DMM"),[13] as in effect for the years at issue, required that a periodical include a "statement of frequency" of publication, and section E211.5.3 provided:

All issues must be published regularly as called for by the statement of frequency. * * * If a publication does not maintain regular issuance according to its stated frequency, even after USPS notice, the RCSC [Rates and Classification Service Center] serving the known office of publication revokes the publication's Periodicals mailing privileges.

A favorable postal rate is important to an organization that sends mail to 2.5 million members. NEA therefore needed to fulfill the commitment it made in its statement of frequency.

### 4. *The irrelevance of a right to cease publication*

Even if we assume that NEA had the prerogative of ceasing the publication of one or both of the periodicals at issue, that assumption does not resolve the issue in NEA's favor. Under the regulation, the question is simply whether dues-paying members have "the right to receive an exempt organization periodical". The fact is that during the periods at issue NEA

---

[13] See 39 C.F.R. sec. 111.1 (2011) ("the U.S. Postal Service hereby incorporates by reference in this part, the Domestic Mail Manual"). Sections 5.3 and 10.5(c) are identical in DMM Issue 55 (Jan. 10, 2000), Issue 56 (Jan. 7, 2001), and Issue 57 (June 30, 2002). The parties' stipulation includes excerpts from the 2005 version of the DMM, but we rely on the versions in effect for the years at issue without deciding whether their terms are regulations with the force of law or simply facts of which we take judicial notice pursuant to Federal Rule of Evidence 201.

did publish the periodicals. Given that the periodicals were published, NEA's bylaws establish that the members were entitled to receive them. After each year-end, when NEA was preparing its tax returns, NEA already knew that it *had* published the magazines in the prior year and that its members had received them as they were entitled, making it irrelevant whether the members would have had a right to receive the magazines if NEA had stopped publishing them.

C. *NEA's affiliates' grant of the right to receive the periodicals*

All four of the State affiliate enrollment forms in the record list the same amount—$4.50—as the amount of a member's dues allocable to a subscription to NEA Today; and we presume that the forms for the other affiliates are equivalent. [14] NEA acknowledges that the State membership enrollment forms in the record "mentioned" the publications as a benefit of membership. But NEA claims that it "does not control those state entities or the language on their application forms." Even if true, however, that claim of non-control does not undo the effect of the affiliates' statements.

The only means for joining NEA is to join an affiliate, and NEA authorizes its affiliates to solicit membership applications. The NEA-authorized affiliates' forms promise the publications. By signing a State affiliate's enrollment form, an applicant agrees to pay membership dues to the affiliate and to NEA in exchange for, in part, receiving a subscription to NEA's periodicals. The affiliate thus induces the applicant's payment of dues in return for (inter alia) the promise that NEA will provide the periodical. In so doing, the affiliate only echoes what NEA regularly announced on its masthead ("NEA Today is mailed *to all NEA members as a benefit of membership*" (emphasis added)) and what NEA's Handbook stated ("NEA members receive a variety of timely and informative periodicals, including NEA Today"). Accordingly, the following common law principles of agency apply:

---

[14] See *Wichita Terminal Elevator Co. v. Commissioner*, 6 T.C. 1158, 1165 (1946) ("The rule is well established that the failure of a party to introduce evidence within his possession and which, if true, would be favorable to him, gives rise to the presumption that if produced it would be unfavorable"), affd. 162 F.2d 513 (10th Cir. 1947).

> In order to bind the principal [i.e., NEA], the agent [i.e., the affiliate] must have either actual or apparent authority, or the principal must ratify the agent's acts. *Trans World Travel v. Commissioner*, * * * [T.C. Memo. 2001–6, 81 TCM (CCH) 979, 983]. Authority may be granted by express statements or may be derived by implication from the principal's words or actions. Restatement, Agency 2d, sec. 26 (1957). Whether an agent is authorized to act for the principal is decided by taking into account all the circumstances, including the relationship of the parties, the common business practices, the nature of the subject matter, and the facts of which the agent has notice concerning objects the principal desires to accomplish. *Id.* at sec. 34. * * * [*Gouveia v. Commissioner*, T.C. Memo. 2004–256, 88 TCM (CCH) 424, 431.]

An individual signing an affiliate's enrollment form would have every reason to believe that the State affiliate, as the agent, had authority to bind NEA, the principal, to delivering the periodicals as the benefit that NEA had promised and according to the publication schedule that NEA had announced. The State enrollment forms explicitly stated that a specific portion of the member's dues went toward a one-year subscription to NEA Today, and the enrollment forms correctly indicated that joining the State affiliate was not possible without also joining NEA.

The State affiliates had at least apparent authority as agents to bind NEA to provide the periodicals; and NEA's words and actions as the principal affirmed the agent-affiliates' representations, giving NEA members the legal right to receive the periodicals.

### D. *Availability of the periodicals on the Internet*

NEA's final argument is that even if its members had a legal right to receive the periodicals, the fact that NEA made the periodicals available free to the general public on the Internet negates the regulation's allocation requirement. [15] That is, NEA contends in effect that because both members and non-members can receive the periodicals on the Internet

---

[15] In support of this argument, NEA cites an unpublished Field Service Advice Memorandum and an unpublished Private Letter Ruling. The IRS objects to this use of an FSA and a PLR, distinguishes them from NEA's case, and counter-cites two unpublished Technical Advice Memoranda. However, such unpublished determinations "may not be used or cited as precedent", sec. 6110(k)(3), and we decline to consider any of these determinations, see *Abdel-Fattah v. Commissioner*, 134 T.C. 190, 202 & n.15 (2010). NEA also cites IRS Announcement 2000–84, 2000–2 C.B. 385, 385, which states: "The growing use of the Internet by exempt organizations raises questions regarding whether clarification is needed concerning the application of the Code to Internet activities". However, this Announcement says nothing about advertising or circulation income.

without regard to the payment of dues, it is not fair to say that members receive the periodicals in return for the payment of dues. This contention is contradicted, however, by two facts:

First, the Internet versions of the periodicals do not include all of the content of the paper editions. The paid advertising and the letters to the editor are available only in the print edition. The record includes no evidence that these features are of no value to members.

Second, that NEA goes to significant expense and trouble to produce the paper editions shows that paper copies of the periodicals have value even in the Internet era. We take judicial notice of the fact that many periodicals have both online editions that one may access without cost and paper editions for which subscriptions must be paid. Evidently, a market still exists for paper publications. A user who has online access to a publication may still value receiving a paper copy. NEA put on no evidence that its members do not value the paper periodicals, and its decision to persist in publishing them is strong evidence to the contrary.

Allocation of dues to circulation income, notwithstanding the free availability of most of the periodicals' content on the Internet, is consistent with the opinion of the Court of Appeals for the Seventh Circuit in *Am. Med. Association v. United States*, 887 F.2d 760 (7th Cir. 1989). The American Medical Association ("AMA") is a tax-exempt organization, organized "to promote the science and art of medicine for the betterment of public health." *Id.* at 762. To further that mission, AMA published two periodicals, the Journal of the American Medical Association (JAMA) and the American Medical News (AM News) *Id.* The periodicals contained medical articles as well as paid advertising. *Id.* AMA members received the periodicals at no additional cost as a benefit of membership. *Id.*

To attract more advertising sponsors, the AMA informed advertisers that it was sending complimentary copies of JAMA and AM News to certain prized groups of physicians called controlled circulation groups. *Id.* Many of the targeted physicians were also dues-paying members of AMA and therefore would have been entitled to receive JAMA and AM News without cost anyway, because of their membership. *Id.* The AMA did not directly inform these targeted physicians that they

were entitled to the free copies as a benefit of their membership. The AMA also did not refund any portion of the membership dues to these prized dues-paying physicians. *Id.*

The Court of Appeals for the Seventh Circuit held that under 26 C.F.R. section 1.512(a)–1(f)(3)(iii), AMA had to allocate a portion of its membership dues from the controlled group to circulation income to the same extent as with the dues of AMA's other members. *Id.* at 777. The court reasoned that "[a]lthough our over-generous physicians paid more for the journal than they needed to, this does not change the basic fact—they *did* pay for the journal, and the publisher was only too happy to keep the unnecessary payment." *Id.* The court concluded that a commercial publisher similarly situated to the AMA would have been "laughing all the way to the bank" as it retained the money paid by the unknowing physicians while purging their names from the controlled circulation list to make sure that those physicians did not receive two copies of the publications. *Id.* Similarly, the court held, dues were allocable to circulation income even in the case of AMA members who would have received the periodicals apart from their payment of dues (i.e., doctors who were in the controlled circulation group and received free copies as such). In the same way, dues from NEA's members are allocable to circulation income even though members can access the content apart from their payment of dues (i.e., via the Internet).

NEA attempts to distinguish its situation from that in *American Medical Association*. NEA argues that its members had "no right to receive" NEA Today and This Active Life because "anyone can get the publications for free", whereas in *American Medical Association* only a limited number of targeted members received the periodicals for free. We disagree that this distinction makes a difference. Whether the periodical content is available without cost to only a few members (as with "controlled circulation" in *American Medical Association*) or to all members and the world at large (as with NEA's periodicals on the Internet), the question is the same: Does the alternative free availability of a publication to a member nullify his right to receive the publication that results from his payment of dues? We agree with the Court of Appeals for the Seventh Circuit that the answer is no. Like the hypothetical commercial publisher who laughed all

the way to the bank in *American Medical Association*, NEA could induce the payment of dues by telling its members that a portion of their membership dues is to pay for a magazine subscription but at the same time could know that the publications are available for free on the Internet. NEA's arrangement with its members required them to pay for the paper editions of the periodicals when they paid their dues, and the additional availability of an on-line edition did not change the fact that the members obtained the paper editions by paying their dues.

## CONCLUSION

26 C.F.R. section 1.512(a)–1(f)(3)(iii), Income Tax Regs., requires an allocation of membership dues to circulation income if the exempt organization's members have a legal right to receive the publications. For the years at issue, NEA members had such a legal right to receive the periodicals. The fact that NEA also made most of the content of the periodicals available on the Internet does not change this conclusion. Consequently, the IRS was correct in requiring NEA to allocate a portion of its membership dues to circulation income. NEA does not dispute the IRS's computations, and therefore NEA must allocate a portion of its members' dues in the amounts that the IRS determined.

To reflect the foregoing,

*Decision will be entered under Rule 155.*